Curia, per

Withers, J.
To the professional carrier of passengers, the stringency of the common law rule of responsibility, in its full extent, as it concerns the common carrier of goods by land or water, has not been held applicable by the Courts of England or America. Few cases, however, have been decided upon the precise point presented here, that is to say, whether a carrier, such as the defendant, is liable to the owner for receiving and transporting his slave, (who, though property, is also a being of intelligence and will, capable of conceiving and executing a device,) without a written authority from his master, notwithstanding he assumed to be under the dominion of a white man present, and the white man asserted dominion over him. Indeed, it cannot be said that any case has been found in the law books of the slaveholding States, (and of course none need be sought elsewhere,) that can be regarded as an admonition, or a guide to us upon this point.
In Kentucky, (Johnson & Co. vs. Bryan, 1 B. Munro, 292,) a stage proprietor was made liable for the act of his agents, in receiving and transporting a slave from Paris to Maysville, whereby he escaped to Ohio, and was lost to his owner. But that action was brought under a Statute of Kentucky, which provided as follows, to wit: — “ that it shall be unlawful for the owners and proprietors of any mail stage or other coach, or rail road car, to suffer or permit any slave or slaves to go as passengers therein, without a written request of their owners, or in company of their owners” — then fixing a specific penalty, besides declaring a liabitity for the full value of such slave escaped, as well as costs and damages incurred in attempting the recovery of a slave. In that case, too, there was no white person enao-ed in deluding the agents of the defendants by a claim of *160 ownership or dominion over the slave — nor did he present any guise of his true purpose in any form. The Kentucky Judge, who delivered the opinion, expressed his impression that, at common law, the defendant would have been regarded as liable, in which impression we should be ready to agree with him; but the case was rested upon the statutory provision.
A like case was adjudged in Missouri, (4 Missouri Rep. 550,) but that also stood upon a provision by statute of similar import.
In North Carolina, (Robards vs. McLean, 8 Iredell, 522,) a question went up on appeal, upon a point in the law of evidence; but the defendant escaped, upon a case to this effect: his driver (of a mail coach) overtook the plaintiff’s slave, on the .road from Granville to McDowall county. He transported him to Greensboro’, whence he made his escape, and was wholly lost to his owner. It appeared from parol evidence, held to have been admissible, that the negro was going homeward to his master, and by his direction and arrangements, with a written note addressed to a witness examined, wherein that witness was requested, if the negro’s mule should give out, to let him have a horse and ten dollars, and to give him any other assistance he might require. But no authority whatever was given by the witness to the stage-driver to do any thing in relation to the negro. As already stated, the plaintiff lost the verdict — but the point urged in our case, was not presented on appeal. If urged below, it was urged in vain, and not carried up to the appellate jurisdiction.
We get little light, therefore, by any research permitted by our opportunity from any adjudicated case; and are, consequently, remitted to such as we can borrow from our own reasoning upon general principles; for our own cases teach no more, than that, in the process of carrying a slave, on land or water, the severity of the* rule as to the transportation of inert matter, by a common carrier of goods, shall be so far relaxed as to conform to the material consideration that the slave has an uncontrollable agency in counteracting the highest diligence of the bailee, and may rush into injury and destruction in spite of all caution: (Clark *161 ads. McDonald, 4 McC. 223,) that a bailee shall be held accountable, absolutely, if he disregard the true import or express restrictions of the bailment, (Duncan vs. R. R. Company, 2 Rich. 613;) that the officious interference with or use of the property of another, will render the party guilty thereof liable— (Wright vs. Gray, 2 Bay, 464.) This case cannot be made to rest on any of those cited ; nor upon the principle announced as that on which the case of Harrison vs. Berkely, (1 Strob. 525,) rested, which was, that Berkely had done an act from which damage ensued, which act was prohibited by law to be done at all. In fact, the leading question in that case appears to have been, whether the damage complained of was sufficiently proximate or too remote.
The doctrine candidly announced by the defendants’s counsel is, that a want of authority from the master, and a prohibition of the act by him, are equivalent propositions. This position would discard all question about negligence, and amounts to an affirmation that a rail road company, engaged in its lawful and compulsory duties, are guarantors against every possible fraud, that may be executed by any one, against the rights of property of a slave-owner; that the company shall stand towards him as a Bank, being the depositary of his money — responsible against the most astute forgery of his name.
If we were to hold such a rule of law, there would be presented an incongruity involving a distinction without a difference in principle. For example, the carrying a slave is the carrying a passenger, though he is also property: Boyce vs. Anderson, 2 Peters’s (U S.) R. 150: a less degree of responsibility is exacted than in the case of a bale of goods, in regard to the course of the journey; a less degree as to all passengers ; why should we hold a more rigid rule in regard to the act of receiving the negro on a car, than that which fixes the care and diligence exacted in the process of his actual transportation ? If the rule urged upon us were adopted, it would seem to make the transportation of slaves by the rad road quite an impracticable business. We should exact an investigation of title to such property *162 upon a peril to the company, which would compel them either to decline a business that the law commands them to perform, as public carriers of passengers, or else to encounter losses that might be oppressive, if not ruinous. If the plaintiff had been travelling with the servant, who has escaped, in Georgia, where he may have been unknown, and he had been challenged as the owner by the conductor of a train of cars, it is most probable he could have produced no other evidence of ownership than was presented by Eaton in this case to Dr. Davis — that is, the claim of dominion asserted by him and corroborated by the slave. If the conductor, in such case, should be supposed to decide against the plaintiff’s claim, and reject his slave as a passenger, whereupon the slave was lost to the plaintiff, his case for damages would certainly not be weaker than the present.
Although such a course of reasoning, ah inconvenienti, is not a conclusive test of legal principles, yet, upon remembering that the whole doctrine of the law of carriers has been, in great degree, planted upon such a basis, it furnishes a medium, not inappropriate, through which we may look at the question before us. It would be easy to pile up suggestions drawn from such a source.
It must, therefore, be a question of negligence. We are prepared to affirm that we consider it a legal duty to demand of rail road companies a high degree of caution, diligent and circumspect demeanor, in dealing with slaves as passengers ; that this duty is enforced by the facility of escape which their mode of conveyance would offer to absconding slaves by the rapidity of a daily journey between distant points, especially if a sleepless vigilance should give way to any degree of carelessness; and that if the plaintiff, in this case, had obtained the verdict, we are not prepared to say it would have been disturbed. And it may be added that, but for the fact already adverted to, that a white man claimed dominion over the negro, and the latter responded to the claim, which there is no reason to affirm the conductor in charge had the personal knowledge of the white man, (though others had) that should have led him to question *163 and suspect, we should probably have been dissatisfied with the verdict, if, indeed, it would, in such case, have been rendered.
The jury were led to the inquiry, whether there had been, on the part of defendant, an interference with plaintiff’s slave— ‘•'wilful, officious, careless, or otherwise blameable, done with a knowledge, or with just grounds for suspicion, that it was contrary to the will of the owner.” All the circumstances, developed by the evidence, in behalf of the plaintiff’s view, were arrayed before the jury, with illustrations, which we do not deem justly exceptionable, designed to elucidate the proposition above stated. The tribunal to settle such a question has reached a result unfavorable to the plaintiff; and while we lament that his rights have been so successfully invaded by so bad a man as Eaton and so irresponsible, still we do not feel warranted to visit the misfortune upon a party who, in the opinion of a jury, has been no more than a blameless, unwitting instrument towards the perpetration of a detestable crime.
The motion must, therefore, be refused.
O’Neall, Evans, Wardlaw and Fb,ost, JJ. concurred.

Motion refused.